**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

KAREN L. RIVERS,                                     :

      Plaintiff,                                     :

vs.                                     :      CA 14-0251-C

CAROLYN W. COLVIN,                     :
Acting Commissioner of Social Security,
                                     :
      Defendant.

## MEMORANDUM OPINION AND ORDER

In this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of an adverse social security ruling denying a claim for disability insurance benefits (Docs. 1, 10). The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 14 & 15 ("In accordance with  provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief and having the benefit of oral arguments, it is determined that the Commissioner's decision denying benefits should be affirmed and this action dismissed.[1]

---

[1]    Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 19 & 20 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

Plaintiff applied for a period of disability and disability insurance benefits on November 4, 2001 (Tr. 62), alleging a disability onset date of June 30, 2008 (Tr. 113-17). At the administrative hearing, Plaintiff was fifty-three years old (Tr. 46), had completed a GED (Tr. 47), and had a previous work as a telemarketer, cashier, and cafeteria attendant (Tr. 58).  Plaintiff claimed disability due to coronary artery disease, bladder cancer, neck, back, and leg pain, and restless leg syndrome (Tr. 132).  The Administrative Law Judge (ALJ) made the following relevant findings:

1. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.**

2. **The claimant has not engaged in substantial gainful activity since June 30, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).**

3. **The claimant has the following severe impairments: major depressive disorder, degenerative disc disease of the lumbar spine, status post bladder cancer, migraine headaches, coronary artery disease, and restless leg syndrome (20 CFR 404.1520(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

   ...

   In activities of daily living, the claimant has mild restriction.  At the consultative examination, the claimant indicated that she is able to feed, bathe, groom, and dress herself without assistance.  She could also use a telephone, manage money, prepare meals, shop for groceries, and drive an automobile all without assistance.  Her hygiene was good and her appearance was neat.  The claimant also indicated that she watched television, cooked, and did dishes (10F).

   In social functioning, the claimant has mild difficulties.  The claimant indicated that she went to the grocery store and to church.  She stated that she liked to visit a friend in her free time (10F).  She lives with her husband and two children.

   With regard to concentration, persistence or pace, the claimant has moderate difficulties.  At the consultative examination, the claimant was alert and oriented to person, place, time, day, date, and purpose for the evaluation.  She was able to focus and sustain attention, with no

significant distraction from extraneous stimuli.  She completed the serial 3's task without error and accurately spelled WORLD backwards.  She performed basic mathematical evaluations accurately (10F).  The claimant indicated that she enjoyed watching television, which suggests at least some degree of concentration/attention.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairment does not cause as least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria that satisfies medical listing 12.04, *Affective Disorders.*  Medical evidence of record does not indicate that the claimant has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work with repeated episodes of decompensation.  The claimant is not adversely affected by minimal change and does not require a highly supportive living arrangement.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listings of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

5. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and carry no more [than] 20 pounds occasionally and ten pounds frequently. The claimant is not capable of overhead reaching or climbing ladders, ropes, or scaffolds.  She cannot work around unprotected heights or dangerous equipment.  She can occasionally operate foot controls, climb stairs and ramps, stoop, kneel, crouch, and crawl.  The claimant would need to alternate between sitting and standing positions every 30 minutes but would not need to leave the workstation.  The claimant cannot make judgments on anything except simple work-related decisions.  Changes to the work setting or routine must be minimal. She must avoid work tasks involving a variety o[f] instructions or tasks but is able to understand and carry out simple one-to-two-step**

3

**instructions. The claimant is able to understand and carry out detailed but uninvolved oral or written instructions involving few concrete variables from standardized situations.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5, 96-6p and 06-3p.

…

At the hearing, the claimant stated that she lives in a mobile home with her husband and two children ages 13 and 15. She has a GED and can read and write. The claimant indicated that she last worked in 2008 as an assistant manager at a Hardees restaurant. She stated that she could not physically do the work and could not concentrate on mental aspects of the work. For example, when making a hamburger, she could not remember what ingredients to use. She worked at Dollar General in 2007 but stated that she could no longer do the job of a cashier. She also worked as a cafeteria attendant for about three to four months. She stated that she has not looked for work since 2008. The claimant noted that she does have health insurance.

When asked about her impairments, the claimant stated that she has ongoing issues related to her back and neck. She has pain in her hips that radiates upward. She takes hydrocodone, Soma, and something for headaches. She indicated that hydrocodone makes her very sleepy. The claimant stated that she saw a surgeon from 2003-2006 but does not have those records. This physician referred her to pain management.

The claimant stated that she was diagnosed with bladder cancer in July of 2010, and her bladder was removed. She stated that she has been cancer free for about a year. She noted that she has heart disease, and a cardiologist monitors her condition.

As for her mental health, the claimant stated that she had a psychiatrist about 12 years ago when she noticed that she could not focus. She stated that she was also very irritable. Treatment helped somewhat. She started treatment again in January 2012.

In terms of activities of daily living, the claimant stated that she cannot do chores as quickly as she once could. She washes her children's school clothes. She does not vacuum or dust. She noted that this makes her feel useless because her husband must do her chores in addition to his own. She walks around indoors and tries to concentrate on what needs to be done. She watches some television but does not do crafts or garden. She

cooks for her children but stares out the window most of the day.  She attends church each week.

The claimant estimated that she could walk about 10 minutes at a time.  She can stand 15 minutes at a time and can sit 20-25 minutes at [a] time.  The claimant indicated that the external bag that holds urine also affects her daily activities.  She stated that she must be careful when lifting or the bag will break.  She noted that sweating or sleeping also cause difficulties with the bag.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

After complaints of back pain and leg numbness, a November 2003 MRI indicated very mild bulging disc of L4-5.  There was also very mild []s ligamentous hyperthrophy of L3-4 but there was no spinal or foraminal stenosis (1F).

A September 2008 MRI of the lumbar spine showed mild degenerative disc disease of the lubar spine and a mild annular bulge with small left foraminal protrusion at L2-3 creating mild to moderate narrowing of the left exiting foramina and mild narrowing of the right exiting foramina.  The[re] was also a mild annular bulge of the L3-4 disc with mild narrowing to the origin of each exiting foramina.  A mild broad based annular bulge with small central protrusion at L5-S1 was also observed.  Disc material flattened the thecal sac anteriorly creating borderline narrowing to the origin of each exiting foramina (2F, 17).  Thomas R. Dempsey, M.D., noted that the MRI showed only degenerative changes and no herniated discs; therefore, she was not a surgical candidate.  Additionally, the claimant noted that Lortab and Soma were helping with pain (2F).

Hematuria was noted in July 2010, and the claimant underwent cystoscopy, bilateral retrograde pyelogram, and a bladder biopsy (4F).  High-grade transitional cell carcinoma in situ was noted.  Bacillus Calmette-Guerin (BCG) treatment was started soon afterwards.  Notes from August 11, 2010, indicate that the claimant had a lot of pain, frequency, and urgency after her second BCG treatment.  Notes from August 18, 2010 indicate that the claimant's urine culture was negative, but she still had voiding complaints.  Impressions included carcinoma in situ on BCG and acute cystitis.  By September 30, 2010, the claimant had completed her six-week course of BCG.  She did well.  Weight loss was noted but it was not likely related to her bladder issues (8F).

A cystoscopy, bladder biopsies, and extensive fulguration of the bladder tumor were performed on October 6, 2010, and pathologic findings included transitional cell carcinoma (4F). A three-week maintenance round of BCG was started in December 2010. She had irritative voiding symptoms suggestive of persistent cancer or possibly BCG effect (8F).

On February 7, 2011, the claimant again underwent cystoscopy, bladder biopsy, and fulguration of the biopsy sites. Pathologic findings indicated active chronic cystitis and transitional cell dysplasia (4F).

The claimant was admitted to Providence Hospital on March 13, 2011, and underwent radical cystectomy and ileal conduit formation. She recovered uneventfully and was transferred to the intensive care unit where she had a good recovery. She did have some postoperative pain that lasted for five to six days. After she was weaned [] from intravenous antibiotics, an oral medication[] controlled her pain as well. On discharge on March 19, 2011, the claimant was able to tolerate a normal diet and ambulate without assistance. Her ostomy bag was functioning properly with clear drainage, and she had a good output. She still had her ureteral stents in place, and she was to follow up in two weeks. Her pathology returned showing that she had transitional cell carcinoma in situ of the bladder with no evidence of malignancy in the surgical margins, lymph nodes, or ureters (5F).

…

The claimant went to Springhill Center on August 24, 2011, with a chief complaint of chronic lumbar and abdominal pain. The claimant indicated that she had recovered from surgical excision of the bladder secondary to cancer, and her pain was stable on her current medication. She also indicated that her activity level had increased. She denied neurologic changes. The claimant rated her pain a 5/10 in severity. Diagnoses included bladder cancer, sacrolitis, lumbar degenerative disc disease, cervical pain, and spasm. Her treatment plan included Zanaflex and Lortab (7F).

Notes from October 7, 2011, about six months after the claimant's radical cystectomy and ileal loop, reflected that she was doing well. She had no weight loss, bone pain, or gross hematuria. Physical examination revealed a healthy woman. A renal ultrasound showed normal kidneys bilaterally (8F, 1).

In a January 18, 2012, check-up, the claimant indicated that she was doing well and was not having any real problems with her conduit. There was no bone pain or weight loss. A CT scan of the abdomen and pelvis showed some small renal cysts bilaterally, but otherwise, there were no abnormalities. The claimant reported that she was easily fatigued and tired most of the time. Because her CT showed no concerns, she was told that she could return in six months for follow-up (15F).

Notes from January 23, 2012, indicated that [t]he claimant had hypertension and hyperlipidemia.  She was only taking Metarprolol at that time.  The claimant also indicated that she was having mood swings that were not controlled by the Effexor she had been prescribed (14F).

Springhill Center notes from February 13, 2012, indicated a chief complaint of chronic lumbar and cervical pain.  She continued to do well after bladder excision secondary to cancer.  The claimant stated that her pain level was stable.  She denied complications from medications.  The claimant reported that her pain was a 3/10 in severity.  Cardiac pulses were normal and of regular rate and rhythm.  Cervical range of motion was decreased but stable.  Lumbar range of motion was decreased but stable.  There was mild posterior cervical tenderness diffusely without trigger points.  There was moderate tenderness over both sacroiliac joints.  There was mild facet tenderness from L3 to sacrum.  Upper and lower extremity range of motion was unchanged and appropriate.  Treatment plan included continuation of Lortab and Zanaflex.  She was also taking Topirmate, Soma, Oxybutin, Metaprolol, potassium chloride, Effexor ER, Quinapril, Omeprazole and HCTZ (13F).

Notes from March 5, 2012 indicated that the claimant reported swelling of the legs and feet.  She had been prescribed Abilify, and she noted that she was doing much better on medication (14F).

On March 27, 2012, the claimant went to Mobile Heart Specialists complaining of increasing dyspnea on minimal exertion.  She had been place[d] on an inhaler but was not on statin due to an elevated liver function test.  She was not having angina.  She did have some orthpstatic presyncope, and her blood pressure was 136/90.  An EKG showed bradycardia but was otherwise normal (17F, 2).  Notes from May 8, 2012, indicated that the claimant's stress test and echocardiogram looked okay.  Impressions included known coronary disease with a low-risk stress test, carotid stenosis without stroke, controlled hypertension, and dyslipidemia.  She was given nitroglycerin to use as needed (17F, 1).

During that period, the claimant also returned for a back pain treatment on May 7, 2012.  She complained of low back pain with numbness and tingling.  Diagnosis included chronic low back pain with radiculopathy.  A May 31, 2012, x-ray showed normal alignment of the spine.  There was no fracture or destructive bony lesion.  Disc space narrowing with minimal anterior spurring was present at L2-3 and L4-5 (19F).

On August 30, 2012, the claimant complained of bilateral leg pain and lower back pain.  Michael Ederer, D.O., noted that x-rays showed some worsening from the previous study.  She underwent a left hip steroid injection on October 26, 2012 and November 13, 2012 (19F).

A November 5, 2012 CT scan of the abdomen and pelvis showed no metastatic disease with the abdomen or pelvis.  There was [] no significant

change from January study (18F, 4). A chest x-ray showed that the claimant's heart size was within normal limits. Degenerative spurring was seen in the lumbar spine (18F, 2).

The claimant underwent a cervical spine MRI on January 7, 2013, impressions included mild degenerative changes of the cervical spine with no canal or neural foraminal stenosis (20F, 11).

On January 21, 2013, the claimant went to Mobile Diagnostic Center to discuss her conditions. Examination revealed that the claimant's active problems to be arteriosclerotic cardiovascular disease (ACD), benign hypertension, hyperlipidemia, depression, and vitamin D deficiency (21F).

Turning to the claimant's mental health, in a consultative mental examination report dated January 5, 2012, the claimant reported that she had bladder cancer effectively treated by surgery; however, she noted that the ostomy bag interfered with work because it could leak at any time. She also reported a 17-year history of problems with heart disease, a seven-year history of problems with back pain (attributed to deteriorating disc disease), and a nine-year history of problems with apparent depression (marked by periods of irritable and sad mood). The claimant denied having symptoms of any other medical or psychiatric problem that might interfere with work. Kenneth R. Starkey, Psy.D., indicated that the claimant's speech was generally clear and coherent and of appropriate rate and volume. Her thinking was rational and there was no evidence of significant deficits for reasoning or judgment. There was no evidence of delusional thought processes or paranoia. There was no loosening of associations, flight of ideas, or ideation or tendencies. Intellectual functioning was estimated to be in the Low Average range. The claimant's attention and immediate memory appeared generally intact. In regard to recent memory functions, she reported the day's activities without difficulty and the prior day's activities also without difficulty. As for remote memory, she reported employment dates and school dates with only mild difficulty. Her fund of knowledge appeared generally adequate. There was no evidence of auditory or visual hallucinations. Her mood was generally euthymic and her affect was congruent with this mood. Her insight and judgment appeared adequate. Dr. Starkey's diagnostic impressions included depressive disorder in partial remission. He reported that the [] claimant's Global Assessment of Functioning (GAF) was 67. According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, a GAF of between 61 and 7 represents some mild symptoms or some difficulty in social, occupational, or school functioning. Dr. Starkey opined that the claimant's ability to understand, remember, and carry out simple/concrete instructions appeared adequate (from a psychological perspective). Her ability to work independently also appeared adequate. Her ability to work with supervisors, coworkers and public appeared adequate, as did her ability to manage common work pressures (10F).

In a psychiatric review technique dated January 6, 2012, M. Hope Jackson, Ph.D., opined that the claimant had mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.   She noted no episodes of decompensation of extended duration (11F).

Records reflect that John I. Bailey, Jr., M.D., first examined the claimant on January 16, 2013.  She complained of feeling worthless.  He noted that the claimant had good attention a[nd] was able to establish rapport.  She had a blunt affect and was tearful at times.  Her thoughts were logical and memory seemed intact.   A bipolar screen was positive.   Assessment included bipolar depression and adjustment reaction with anxiety and depression.   Abilify was continued.   Dr. Bailey met with the claimant again on February 20, 2013, and she complained of being sluggish and sleepy.  Her Effexor was increased a lithium augmentation or increase in Ability was recommended (22F).

In a note dated March 6, 2013, Dr. Bailey opined that the claimant's chronic psychiatric burdens were unusually severe and extensive, and to that point, they had not responded to medication well at all.  He stated that she had a predisposition to severe depression and had more than one kind of depression.  He indicated that the claimant knew there was no possibility of improvement in any of her serious medical problems (disc disease, heart disease, gastric bypass, absence of bladder, and ostomy). He opined that any emotional improvement would be slow.  He also opined that the claimant could not achieve any gainful or practical employment (22F).

In a residual functional capacity questionnaire dated March 6, 2013, Dr. Bailey opined that the claimant had marked limitations in activities of daily living and in maintaining concentration, persistence, or pace.  She had extreme limitations in social functioning.   He also noted marked limitations in her ability to understand, remember, and carry out instructions, respond appropriately to co-worker, and perform repetitive tasks in a work setting (24F).

After a thorough examination of the evidence, the undersigned finds the claimant's testimony less than fully credible.  For example, the objective evidence regarding the claimant's back, hip, and neck problems is minimal.   There are objective findings that would establish a condition that would cause some pain; however, the level of pain the claimant alleges is not credible.   Disc bulging and degenerative changes were repeatedly referred to as "mild" (1F and 2F), and no foraminal or neural stenosis was noted (13F).  The claimant also reported improvement with Lortab and Soma (2F).  Although the claimant had minimal treatment for her musculoskeletal complaints, she alleged that the pain [] has kept her from working.  Nevertheless, the claimant has been able to care for her family by doing the laundry and cooking quick meals.  Her pain does not

seem to prevent her from watching television, and she is able to attend church.

While the claimant's bladder cancer required aggressive medical management, it did not appear to preclude[] all work for a full 12 months. The undersigned notes that the claimant must wear an ostomy bag, and because of that, she should not do strenuous work as accounted for in the residual functional capacity.  Notes show that the claimant's pain was under control (5F), and she was not having problems with her conduit (15F).

As for her other impairments, a recent echocardiogram and EKG were normal (17F), and the claimant's reports of headache or restless leg symptoms were infrequent at most.

The claimant's biggest problem appeared to be her depression; she testified that she spends a portion of her day staring out a window.  Dr. Bailey's statements that the claimant was essentially non-functional seem to be out of proportion with what has [been] her lifelong level of functioning and even her current testimony.  Dr. Bailey indicated that the claimant had extreme social functioning deficits, yet she testified that she goes to church each week.  Further, other medical records fail to establish this level of depression.  Although the condition was listed in other doctors' reports along with anxiety, the claimant also reported that she was doing much better on Abilify (14F).  Additionally, Dr. Bailey has a rather short treatment history with the claimant.  He first examined the claimant in January 2013.  While he indicated marked daily living difficulties and marked concentration difficulties, such deficits are not evidenced from treatment notes.  In fact, although the claimant had had some treatment for depression in the way of medication, none of her other doctors in the past five years referred her to a mental health specialist or mentioned that she was in a non-functioning state due to her mental health.  In fact, Dr. Jackson actually indicated that the claimant did not have a severe mental impairment at all (11F).  Thus, little weight is accorded to [] Dr. Bailey's opinion.

Although non-examining, Dr. Jackson's opinion deserves some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions as discussed above.

**6.     The claimant is capable of performing past relevant work as cashier II. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**

At the beginning, the vocational expert testified that given the above residual functional capacity, the claimant would be capable [of performing] her past relevant work as cashier II, DOT# 211.462-010.  It is performed at the light exertional level and has a specific vocational

preparation of 2.  The vocational expert indicated that the claimant could perform the job as it is actually performed.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually performed.

…

7.    **The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2008, through the date of this decision (20 CFR 404.1520(f)).**

(Tr. 26, 28 & 29-36 (emphasis in original)).  The Appeals Council affirmed the ALJ's decision (Tr. 1-4) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005.  An ALJ, in turn, uses a five-step sequential evaluation to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform h[is] past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.  *Watkins v. Commissioner of Soc. Sec.*, 457 Fed. App'x 868, 870 (11th Cir. Feb.

9, 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted).

If a plaintiff proves that she cannot do her past relevant work, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable— given her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Id.*; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985). Finally, but importantly, although "a claimant bears the burden of demonstrating an inability to return to his past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform her past relevant work as a cahier II, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1,

---

[2]      "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

[3]      This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).  And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'"  *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Rivers asserts three reasons why the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ erred as a matter of law by failing to properly assess the opinions of treating physician, John I. Bailey, M.D.; (2) the ALJ's mental and physical residual functional capacity determination is not supported by substantial evidence; and (3) the ALJ failed to properly assess the credibility of the claimant. The Court will address each issue in turn.

A. __The ALJ Erred as a Matter of Law by Failing to Properly Assess the Opinions of Treating Physician, John I. Bailey, M.D.__  Plaintiff challenges whether the ALJ properly evaluated and gave appropriate weight to the opinions of Dr. John I. Bailey, M.D., a family physician. (Plaintiff's Brief, Doc. 10 at 9-16) His opinions are contained in a questionnaire that he completed on March 6, 2013, a questionnaire designed to obtain the opinions of a treating physician as to a patient's residual functional capacity. (Tr. 441, 467-68).  Dr. Bailey's answers to questions 11 and 12 of the questionnaire include a diagnosis of atypical bipolar disorder associated with chronic pain, degenerative disc disease of the cervical lumbar spine, ischemic heart disease, status post gastric bypass and status post bladder cancer with cystectomy and urostomy. (Tr. 441).  Given these problems, he opined that Plaintiff has marked restrictions in activities of daily living and extreme difficulties with maintaining social functioning. (Tr. 467)  He also found that she would have a marked deficiency in the areas of concentration, persistence or pace that would significantly erode her ability to

13

complete tasks in a timely manner. (*Id.*)  Dr. Bailey also determined that she would have marked limitations in her ability to understand, carry out, and remember instructions, respond appropriately to co-workers and perform repetitive tasks in the work place. (*Id.*)  In response to question eight as to when the plaintiff first suffered the functional limitations at the level of severity indicated by his responses in the questionnaire, Dr. Bailey estimated the time period to be "10-20 years ago (from 2013) but was serious even before then." (Tr. 468).   The final question (#12) asked for his comments and prognosis to which he responded:

> The chronic psychiatric burdens of this pleasant, legitimately ill (both medically and psychiatrically) woman are unusually severe and extensive and to this point have not responded to medication well at all.  I doubt they will ever respond what most people would call well.  She clearly has a predisposition to severe depression and has more than one kind of depression.  Worse, there is, and she knows there is, no real possibility of improvement in any of her most serious medical problems (disc disease, heart disease, gastric bypass, absence of bladder, ostomy).  Any emotional improvement will be slow.  This woman cannot achieve any gainful or practical employment.

(Tr. 441).

The ALJ gave little weight to Dr. Bailey's opinions of March 6, 2013 for a number of reasons:

> The claimant's biggest problem appeared to be her depression; she testified that she spends a portion of her day staring out a window.  Dr. Bailey's statements that the claimant was essentially non-functional seem to be out of proportion with what has [been] her lifelong level of functioning and even her current testimony.  Dr. Bailey indicated that the claimant had extreme social functioning deficits, yet she testified that she goes to church each week.  Further, other medical records fail to establish this level of depression.   Although the condition was listed in other doctors' reports along with anxiety, the claimant also reported that she was doing much better on Abilify (14F).  Additionally, Dr. Bailey has a rather short treatment history with the claimant.  He first examined the claimant in January 2013.   While he indicated marked daily living difficulties and marked concentration difficulties, such deficits are not evidenced from treatment notes.  In fact, although the claimant had had some treatment for depression in the way of medication, none of her other doctors in the past five years referred her to a mental health specialist or

mentioned that she was in a non-functioning state due to her mental health.  In fact, Dr. Jackson actually indicated that the claimant did not have a sever mental impairment at all (11F).   Thus, little weight is accorded to [] Dr. Bailey's opinion.

(Tr. 34).

As the plaintiff's treating physician, Dr. Bailey's opinions "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Gilabert v. Comm'r of Soc. Sec.*, 396 F. App'x 652, 655 (11th Cir. Sept. 21, 2010) (per curiam) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).   Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)).   Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error.  *Id.* (quoting *Moore* [*v. Barnhart*], 405 F.3d [1208,] 1212 [(11th Cir. 2005)]).

Here, the ALJ gave little weight to Dr. Bailey's opinions regarding the Plaintiff's functional abilities given her psychiatric impairment because the ALJ found that Dr. Bailey's assessment is inconsistent with Plaintiff's "lifelong level of functioning," her testimony before the ALJ and the other medical evidence in the record.  On appeal, the Plaintiff argues that Dr. Bailey's opinions should have been given controlling weight but after a review of the record, the briefs and conducting oral argument, it is determined that the ALJ had good cause to give little weight to Dr. Bailey's opinions because his conclusions regarding the Plaintiff's ability to work are inconsistent with Plaintiff's vocational and treatment history.

The ALJ noted that Dr. Bailey had only begun treating Plaintiff in January 2013 (Tr. 34, 456-64).  *See* 20 C.F.R. § 404.1527(c)(2)(i) (treating physician's opinion merits less weight when treating relationship is shorter).  When he completed the Residual Functional Capacity Questionnaire, approximately two months after his initial examination, his opinions were based on clinical evaluations without any psychological testing.  (Tr. 468).

Even though the Plaintiff clearly had a relevant work history prior to 2008, the alleged onset year, Dr. Bailey opined that she had been suffering from incapacitating bipolar depression for as many as twenty years and possibly longer.  (*Id*.).  Not only is this opinion inconsistent with Plaintiff's work history but as the ALJ noted, even though Plaintiff had received some treatment for depression in the way of medication, none of her physicians in the five years preceding her relationship with Dr. Bailey had referred her to a mental health specialist or mentioned that she was in a non-functioning state due to her mental health (Tr. 34, 190-440).

Approximately one year before Plaintiff first visited Dr. Bailey, a consultative examination had been performed in January 2012. (Tr. 346).  Dr. Kenneth R. Starkey reported that Plaintiff had rational thinking and no evidence of significant deficits for reasoning or judgment (*Id*).  Her intellectual functioning was estimated at low average, and her attention and immediate memory appeared generally intact.  Her fund of knowledge was generally adequate, and her GAF was 67.  Dr. Starkey opined Plaintiff could understand, remember, and carry out simple instructions; work independently; work with supervisors, coworkers, and the public; and manage common work pressures (Tr. 347).

The record also contains an opinion by the state agency consultant, Dr. M. Hope Jackson, Ph. D. She opined, based on the evidence through January 6, 2012, that the

Plaintiff did not have a severe mental impairment, let alone one of disabling severity. (Tr. 357). Although non-examining, Dr. Jackson's opinion deserves some weight, particularly when assessing whether good cause exists for not affording controlling weight to the opinions of a treating physician.

For the foregoing reasons, the undersigned finds that the ALJ did not err by giving little weight to Dr. Bailey's opinions.

**B.**   **The ALJ's Mental and Physical RFC Determination is not Supported by Substantial Evidence**. In her brief, plaintiff argued that the ALJ's mental ***and*** physical RFC determination is not supported by substantial evidence (Doc. 10, at 16). This Court finds, however, that the physical and mental limitations noted by the ALJ are supported by substantial evidence in the record as is the RFC assessment.

Initially, the Court notes that the responsibility for making the residual functional capacity determination rests with the ALJ. *Compare* 20 C.F.R. §§ 404.1546(c) & 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work

pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins, supra,* 457 Fed. Appx. at 870 n.5 (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)).  In this case, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work[4], except that she:

- could not reach overhead or climb ladders, ropes, or scaffolds;
- could not work around unprotected heights or dangerous equipment;
- could occasionally stoop, kneel, crouch, crawl, climb ramps or stairs, and operate foot controls;
- would need to alternate standing and sitting every thirty minutes but would not have to leave the workstation;
- could not make judgments except as to simple, work-related decisions;
- required minimal changes to the work setting or routine;
- must avoid tasks involving a variety of instructions or tasks but was able to understand and carry out one-to-two-step instructions; and
- could understand and carry out detailed but uninvolved oral or written instructions involving few concrete variables from standardized situations.

(Tr. 28).

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D.Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other

---

[4]   The full range of light work requires standing or walking six hours in an eight-hour workday.  *See* Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).  As such, Plaintiff's contention that the ALJ did not articulate how much Plaintiff could stand or walk during the day (Doc. 10 at 16-17) lacks merit.

requirements of work.'"), *aff'd,* 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013); *see also Hanna v. Astrue,* 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).

In order to find the ALJ's RFC assessment supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at \*3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue,* 2012 WL 1565624, \*4 n.5 (S.D. Ala. May 1, 2012) (noting that

---

[5]      In affirming the ALJ, the Eleventh Circuit rejected Packer's substantial evidence argument, noting, she "failed to establish that her RFC assessment was not supported by substantial evidence[]" in light of the ALJ's consideration of her credibility and the medical evidence. *Id.* at 892.

[6]      It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue,* 2010 WL 3825617, \*3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna,* 395 Fed. App'x at 636 (internal quotation marks omitted))); *see also id.* at \*3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ *could have* relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion].  However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support.  Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen,* 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003). In this case, of course, there is a mental RFC assessment of record from a treating physician and a mental examination report from an examining physician; however, as discussed above, the opinions of Dr. John Bailey were given little weight for good cause.  On the other hand, the report of the mental examination performed by a psychologist, Dr. Kenneth R. Starkey (Tr. 344-347), was accorded significant weight, a determination consistent with substantial evidence in the record, as explained more fully below.

Importantly, in establishing Rivers' RFC, which means determining Rivers' "remaining ability to do work despite [his] impairments[,]" *Packer,* 542 Fed.Appx. at 891—keeping a focus on the extent of those impairments as documented by the credible record evidence—the ALJ sifted through the medical evidence of record (*see* Tr. 28-35), along with the claimant's testimony (*see* Tr. 42-56), to conclude that the residual functional capacity assessment is fully supported by the objective evidence, treatment records, the claimant's activities, and the record as a whole.  Although Plaintiff's functioning is not unlimited, her mild imaging findings, uneventful recovery from her cystectomy, and benign mental examination provide substantial evidence in support of the ALJ's finding that Plaintiff could perform a reduced range of light work.

For instance, the ALJ considered the September 2008 MRI showing mild degenerative disc disease, a mild broad-based annular bulge with small central protrusion at L5-S1, and a mild annular bulge with mild to moderate narrowing of the

left exiting foramina and mild narrowing of the right exiting foramina  (Tr. 30, 212).  At
that time, Dr. Dempsey noted Plaintiff was not a surgical candidate because she had no
herniated discs, and Plaintiff reported Lortab and Soma helped with her pain (Tr. 30,
203, 213).

The ALJ further considered evidence that had Plaintiff completed her six-week
course of BCG treatment for carcinoma, and did well (Tr. 30, 293).  The ALJ noted that
Plaintiff underwent a radical cystectomy in March 2011, recovering uneventfully, with
pain controlled by oral medications (Tr. 30, 238).  At discharge, the ALJ noted, Plaintiff
could ambulate without assistance and tolerate a normal diet (Tr. 30, 238).  The ALJ
further considered that in October 2011 Plaintiff was doing well, with physical
examination revealing a healthy woman (Tr. 31, 278).  Similarly, a January 2012 check-
up showed Plaintiff was doing well, with some small renal cysts but no other
abnormalities (Tr. 31, 381).

The ALJ also noted that, the following month, Plaintiff had a stable pain level
and denied complications from medications (Tr. 31, 367).  Her cervical and lumbar
ranges of motion were decreased but stable, but her arm and leg range of motion was
unchanged and appropriate (Tr. 31, 368).  A May 2012 stress test and echocardiogram
looked okay (Tr. 32, 386).  A May 2012 x-ray showed normal spinal alignment with disc
space narrowing and minimal anterior spurring (Tr. 32, 406).  An August x-ray showed
some worsening, but a January 2013 MRI showed mild degenerative changes in the
cervical spine (Tr. 32, 409, 431).

In terms of mental impairments, the ALJ noted that, at a consultative
examination in January 2012, Plaintiff had rational thinking and no evidence of
significant deficits for reasoning or judgment (Tr. 32-33, 346).   Her intellectual
functioning was estimated at low average, and her attention and immediate memory

appeared generally intact (Tr. 33, 346).  Her fund of knowledge was generally adequate, and her GAF was 67 (Tr. 33, 346-47).  Dr. Starkey opined Plaintiff could understand, remember, and carry out simple instructions; work independently; work with supervisors, coworkers, and the public; and manage common work pressures (Tr. 33, 347).

When the ALJ considered restrictions to daily living, she only found mild restrictions.  Plaintiff informed Dr. Starkey that she was able to "feed, bathe, groom, and dress herself without assistance." (Tr. 27, 345).  In addition, she told him that she could also "use a phone, manage money, prepare meals, shop for groceries, and drive an auto, all without assistance." (*Id*.)  Included in her daily activities that were reported to Dr. Starkey were caring for her ostomy bag, washing off, getting coffee, smoking cigarettes, taking medicine, eating, watching TV, occasionally cooking for her children, sometimes doing the laundry, dishwashing, visiting her friend, going to the doctor, grocery shopping and attending church. (Tr. 347).

This analysis has convinced this Court that the ALJ appropriately considered Rivers' condition as a whole in determining his RFC. Accordingly, the ALJ's RFC determination provides an articulated linkage to the medical evidence of record. The linkage requirement is simply another way to say that, in order for this Court to find that an RFC determination is supported by substantial evidence, ALJs must "show their work" or, said somewhat differently, show *how* they applied and analyzed the evidence to determine a plaintiff's RFC.  *See, e.g., Hanna*, 395 Fed. Appx. at 636 (an ALJ's "decision [must] provide a meaningful basis upon which we can review [a plaintiff's] case"); *Ricks*, 2012 WL 1020428, at *9 (an ALJ must "explain the basis for his decision"); *Packer*, 542 Fed.Appx. at 891-892 (an ALJ must "provide *enough reasoning* for a reviewing court to conclude that the ALJ considered the claimant's medical condition as

a whole[]" (emphasis added)).  Thus, by "showing her work", the ALJ has provided the required "linkage" between the record evidence and her RFC determination necessary to facilitate this Court's meaningful review of her decision.

Because substantial evidence of record supports the Commissioner's determination that Rivers can perform the physical and mental requirements of a reduced range of light work as identified by the ALJ (*see* Tr. 28), and plaintiff makes no argument that this residual functional capacity would preclude performance of her past relevant work as a cashier II, the Commissioner's fourth-step determination is due to be affirmed. *Compare Land v. Commissioner of Social Security,* 494 Fed.Appx. 47, 49-50 (11th Cir. 2012) ("[S]tep four assesses the claimant's RFC to determine whether the claimant is capable of performing 'past relevant work.' . . . A claimant's RFC takes into account both physical and mental limitations. . . . Because more than a scintilla of evidence supported the ALJ's RFC assessment here, we will not second-guess the Commissioner's determination.") *with Phillips v. Barnhart,* 357 F.3d 1232, 1238-1239 (11th Cir. 2004) ("At the fourth step, the ALJ must assess: (1) the claimant's residual functional capacity []; and (2) the claimant's ability to return to [his] past relevant work. As for the claimant's RFC, the regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments. Moreover, the ALJ will assess and make a finding about the claimant's residual functional capacity based on all the relevant medical and other evidence in the case. Furthermore, the RFC determination is used both to determine whether the claimant: (1) can return to [his] past relevant work under the fourth step; and (2) can adjust to other work under the fifth step . . . . If the claimant  can return to [his] past relevant work, the ALJ will conclude that the claimant is not disabled. If the claimant cannot return to [his] past

relevant work, the ALJ moves on to step 5." (internal citations, quotation marks, and brackets omitted; brackets added)).

**C. The ALJ Failed To Properly Assess the Credibility of the Plaintiff.** As part of her credibility finding, the ALJ concluded that Plaintiff's impairments could reasonably be expected to produce some of the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. 29). Plaintiff agues that the ALJ erred when she decided that Plaintiff's ability to perform a few routine chores, watch TV and attend church provided sufficient reasons for finding her not credible.

The Eleventh Circuit has set forth criteria to establish a disability based on testimony about pain and other symptoms as follows:

> the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir.2002) (citations omitted). When such evidence is presented, the Commissioner must articulate explicit and adequate reasons, based on substantial evidence, whenever a claimant's allegations of pain are rejected. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir.1987). When clearly articulated credibility findings are supported by substantial evidence, a reviewing court should not disturb them. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir.1995); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986).

Here, the ALJ articulated numerous examples supporting her conclusion that Plaintiff's subjective complaints of disabling pain were not credible. For example, while

Plaintiff alleged back, hip, and neck pain, the level of pain could only be described as minimal.  The MRI taken in 2003 noted only a very mild bulging disc at L4-5 and mild ligamentous hypertrophy at L3-4 with no spinal or foraminal stenosis.  At that time Dr. Patton wrote a prescription for Tylenol with Codein elixir.  He ordered a bone scan and was to see Plaintiff in three weeks. (Tr. 190)  Coming forward to 2006, Dr. Dempsey commented that the Plaintiff appeared with a normal gait and station and did not appear to be in distress.  She had normal grip strength, normal biceps, triceps, brachioradialis reflexes and a normal distraction and compression test.  She had full range of motion in all extremities and the lumbar region.  The diagnosis was neck pain and back pain for which he prescribed Lortab, Soma and Lyrica. (Tr. 196-97).

Notes from the Springhill Center for Rehab Medicine dated February 13, 2012, contain more complaints of chronic lumbar and cervical pain.  It was noted that she was doing well after her bladder excision secondary to cancer and described her pain level as stable.  She did not report any complications with medications. (Tr. 367-69).  She was prescribed Lortab and Zanaflex.  The impression of the radiologist after her 2013 MRI was "Mild degernerative change of the cervical spine with no canal or neural foraminal stenosis." (Tr. 431).

In addition to the medical records just discussed, the ALJ's determination that Plaintiff's subjective complaints were not credible is further supported by Plaintiff's activities of daily living, which include driving, light cooking, grocery shopping, church attendance and caring for herself and her daughters. These daily activities may be considered in assessing pain. *Harwell v. Heckler,* 735 F.2d 1292, 1293 (11th Cir.1984).

In sum, Plaintiff's contention that the ALJ erred in rejecting Plaintiff's subjective complaints regarding her pain is without merit. The ALJ carefully reviewed and relied upon the medical evidence in the record in making her credibility finding and

articulated reasons supported by substantial evidence in the record supporting her conclusion that Plaintiff's subjective complaints were not as limiting as she contended. Accordingly, the ALJ did not err in rejecting Plaintiff's subjective complaints regarding symptoms and limitations due to pain.

### CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 9th day of September, 2015.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**